IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re ARAMARK SPORTS AND ENTERTAINMENT SERVICES, LLC, a Delaware limited liability company, as owner of a certain 20' 2007 Baja Islander 202 for exoneration from or limitation of liability, <br><br> Plaintiff. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> Case No. 2:09-CV-637-TC-PMW |

Aramark Sports and Entertainment Services, LLC (Aramark) owns a fleet of boats on Lake Powell that it rents to the public. On April 25, 2009, one of the Aramark power boats sank with six people on board. Four people, Terry and Maryanne Taranto, and Robert and Katherine Prescott, died in the accident. Two people, James and Heather Brady, survived.

Aramark filed a petition in this court to limit its liability under the Limitation of Liability Act, 46 U.S.C. §§ 30501-30512, from claims made by the Taranto Estates, the Prescott Estates and James and Heather Brady (the Claimants). The court held a five-day bench trial to resolve the questions of whether any negligent conduct by Aramark employees caused the injury and whether Aramark had privity with the negligent actor or knew of the negligent conduct.

Because the court concludes that negligent conduct by Aramark employees was a cause of the injuries and also concludes that Aramark had privity and/or knew of the negligent conduct, the court denies Aramark's petition to limit its liability.

# FINDINGS OF FACT

I.   **THE PARTIES**

    A.    <u>Aramark</u>

Aramark is a concessionaire for the National Park Service (NPS) in the Glen Canyon National Recreation Area. As concessionaire, Aramark operates the Wahweap Marina, located on Lake Powell just south of the Utah-Arizona border. Aramark operates other marinas on Lake Powell north of the Utah-Arizona border: Dangling Rope, Halls Crossing and Bullfrog.

Aramark will rent a power boat to anyone who is eighteen years or older and has a valid driver's license. No previous boating experience is required.

Lake Powell's main channel is 186 miles long when the lake is at high water. In the spring, the water is cold and the weather is frequently windy. The weather is erratic and can quickly change. In April, wind speeds often exceed thirty miles an hour and can even reach fifty miles an hour. The weather can be calm at one part of the lake but have high winds and waves at another.

    B.    <u>The Claimants</u>

James Brady, Robert Prescott, and Terry Taranto were retired police officers with the St. Petersburg, Florida Police Department. From time to time, they got together socially with their wives. Heather Brady, James Brady's wife, had recently retired from the St. Petersburg Fire Department after twenty-six years as a firefighter and EMT.

In April 2009, the three couples (the Prescott Party) went on vacation together to Lake Powell. Robert Prescott had previously visited Arizona and Lake Powell and, in Heather Brady's words, "Bob [Prescott] was familiar with the area so he just lined up all of the places we would

go." (Trial Transcript dated March 4, 2014 ("March 4 Tr.") at 392 (Dkt. No. 310).)

## II. FRIDAY APRIL 24

### A. Arrival at Wahweap Marina

Members of the Prescott Party arrived at Lake Powell on Friday, April 24, 2009, and checked in at the resort at the Wahweap Marina area. The Bradys and the Prescotts, who arrived at Wahweap Marina on Friday before the Tarantos, went to Aramark's boat rental office to rent a boat for the next day. Phyllis Coon, a rental agent for Aramark, and Karen Ambrosius, Wahweap Marina general manager and the person in charge of boat rentals, were in the office. Mr. Brady, Mr. Prescott, and Ms. Coon discussed Mr. Brady's previous boating experience,[1] the Prescott Party's plans to travel to Rainbow Bridge, which would take a full day, and the weather forecast for Saturday, April 25, the day the Prescott Party would be on the lake. The weather forecast, which was based on National Weather Service data collected at 3:44 a.m. that Friday morning, predicted the weather on Saturday, April 25 as "Breezy, with a south southwest wind, between 15 and 23 mph, with gusts as high as 37 mph." (National Weather Service 7-Day Forecast, Ex. J-7.) Given the weather forecast, Ms. Coon suggested that they "might be more comfortable" on one of the tour boats that was available "because it was chilly on the lake and that going in the power

---

[1] James Brady has some boating experience. He began boating as a young boy, "maybe as early as 10 riding on the boat. Dad and I would fish. From there, high school years running up and down the beach. A friend of mine had a boat. Running up and down the beach. And then my brother, who is now a licensed captain, he went into the fishing scene, so I [rode] on boats with him before, mullet boat." (Id. at 465 (Dkt. No. 310-1).) Mr. Brady has owned several boats, including a 17-foot Mitchell, a 21-foot Mako, and "a couple Voyagers" (a Voyager is sport fishing boat). (Id.) When asked what percentage of his boating experience was in a lake and what percentage was in an ocean, Mr. Brady answered, "95 gulf or bay inland intercoastal and 5 percent lake." (Id. at 472-73.) He estimated that the coldest water he had been in was "70, I believe 70, 72 degrees, [in] Florida." (Id. at 473.)

3

boat they would need to go straight up to Rainbow Bridge just to ensure that they get up there, and then stop at Dangling Rope on the way back to fuel up." (March 4 Tr. at 360 (Dkt. No. 310).) Mr. Brady and Mr. Prescott declined Ms. Coon's suggestion of a tour boat trip, and Mr. Prescott signed the rental contract for a Baja 202 Islander, number 647 (Boat 647). Mr. Prescott was given a copy of the weather forecast (Ex. J-7). Ms. Coon told Mr. Prescott that he would be given an updated weather report the next day before the Prescott Party departed on the boat. But this did not happen.

  B. Boat 647

Boat 647 is just over twenty feet in length and can hold eight passengers. U.S. Coast Guard regulations do not require boats over twenty feet in length to have positive flotation, and Boat 647 did not. (A boat with positive flotation has the ability to float and not sink for a period of time even if filled with water.) Boat 647 had a marine band radio that could receive and monitor both the hailing channel (channel 16) and the weather channel. Type II PFDs (life jackets) were on Boat 647.

The Baja 202 Islander is identified as a design category "C" boat that can withstand an upper limit wind speed of 31 miles per hour. (Baja Marine Owner's Manual, Ex. C at 1.8.) The manual warns: "It is only the most experienced operators and crew that may be able to operate a boat safely under these conditions." (Id.)

## III. SATURDAY APRIL 25

  A. The Weather Forecasts

The National Weather Service maintains a website that is available to the public. Phyllis Coon testified that employees in Aramark's boat rental office accessed the National Weather

4

Service site for weather information. Moreover, it was Aramark employees' general practice to keep the marine band radio on at the boat rental office during working hours to monitor the weather.

The court reviewed several exhibits that showed the National Weather Service's forecasts and advisories for April 24 and April 25, 2009. One of those exhibits included the National Weather Service 7-day forecast given to the Prescott Party, which read, "Breezy, with a south southwest wind, between 15 and 23 mph, with gusts as high as 37 mph." (Ex. J-7.) That forecast, which was the only weather forecast given to the Prescott Party, was last updated at 3:44 a.m. on April 24. At various times after that, on April 24 and April 25, the National Weather Service updated the weather information that, if accessed through the website, would have been incorporated into a 7-day weather forecast similar to the one the Prescott Party received.

In its forecasting system, the National Weather Service divides the United States into geographical areas called "zones" and then issues forecasts for each zone. Two zones relevant to this case are (i) the Arizona Zone 5, which is a fairly small area, just below Lake Powell, and it includes Page, Arizona; and (ii) Utah Zone 21, which covers most of Lake Powell. Zone 21 forecasts give a more accurate prediction of weather conditions on Lake Powell, but a comparison of the two zones' forecasts for the relevant days showed that the forecasts contained similar data. (See Ex. A-120.)

Significantly, the National Weather Service updated the weather forecast at 3:18 p.m. on April 24 (almost twelve hours after issuance of the forecast data given to the Prescott Party) for Zone 5. That update announced a wind advisory in effect from 8 a.m. to 7:00 p.m. on Saturday,

5

April 25, predicting 20 to 35 mile an hour winds and gusts around 45 miles an hour in the late morning and afternoon. (Trial Transcript dated March 7, 2014 ("March 7 Tr.") at 907 (Dkt. No. 313-1).) A new 7-day forecast, if generated for the Prescott Party when they arrived to pick up Boat 647, would have reflected these changes (i.e., increases in wind speed) and a new wind advisory.[2] And shortly before 3 a.m. for Zone 21 the National Weather Service issued a wind advisory for Lake Powell effective from noon on Saturday until 6 p.m. that evening, predicting sustained winds increasing to 25 to 35 miles an hour and gusts to around 55 miles an hour late in the afternoon. (Id. at 902.) A few minutes later, at 3:10 a.m., the National Weather Service issued a wind advisory for Zone 5, Glen Canyon and Page, that would be in effect from 8 a.m. until 7 p.m. on Saturday, April 25. (Ex. K. at 40.) That forecast predicted "South winds 15 to 20 mph with gusts to around 35 mph shifting to the southwest 20 to 30 mph with gusts to around 45 mph in the late morning and afternoon." (Id.)

Alton Ketchersid, Aramark's resident district manager for water operations at Lake Powell, testified that it was his general practice to print the weather forecast at his home each morning at about 6 a.m. so he could distribute it to the administrative office and to the lodge. In his absence, Carrie Markus, an Aramark employee, would distribute it. Both Mr. Ketchersid and Ms. Markus were gone on April 24 and April 25, 2009.

B. Pre-Departure Briefing

Because the Prescott Party had asked to leave early the morning of September 25, Bob Graham, a boat rental instructor for Aramark, met them on the dock at about 7:30 a.m. that

---

[2]The National Weather Service issues advisories to inform the public about potentially hazardous situations. (March 7 Tr. at 885.)

morning (the boat rental office opened at 8 a.m.). Mr. Graham, who was not a witness at trial but testified through deposition, testified that he gave the Prescott Party instructions about the use of the radio, the location of the PFDs, the route to Rainbow Bridge, and the weather forecast (the same one given to the Prescott Party the day before (Ex. J-7)).

According to Mr. Graham, before he met the Prescott Party that morning, he had gone to the rental office before it opened and looked at the weather forecast on the computer. But he testified that the weather forecast he viewed was the same one the Prescott Party had been given the day before.

Mr. Graham testified that he told Mr. Prescott that wind gusts around 37 to 40 miles an hour could be dangerous and that he recommended that the Prescott Party go directly to Rainbow Bridge and return. He told them, "You don't have time to go sightseeing, to do anything else except go up there and get back before the weather turns bad on you." (Dep. of Robert Graham at 21.) The Bradys do not remember this discussion.

    C.    <u>Stopping Boat Rentals</u>

Aramark did not have a written policy addressing when it would stop renting boats because of weather conditions. But Alton Ketchersid testified that "if we were standing on the dock and the wind was blowing 31 miles an hour, we would not rent the boat, no." (Trial Transcript dated March 3, 2014 ("March 3 Tr.") at 101 (Dkt. No. 312).) He explained that "it was not a good practice" to do so. (<u>Id.</u> at 102.) He acknowledged that if the wind speed exceeded 31 miles an hour on the lake, it could be "dangerous" for those on the boats. (<u>Id.</u> at 103.) Mr. Ketchersid testified that the decision whether to stop boats from leaving the marina was "mainly based on the safety of the guests." (<u>Id.</u> at 105.)

7

Phyllis Coon believed that Aramark had "a general practice" of "shut[ting] down all rentals" if there were sustained winds of thirty miles an hour. (March 4 Tr. at 336 (Dkt. No. 310).) Aramark also would not rent boats if wind or weather advisories were issued.

Jon Maris, who was the former Aramark Director of Operations, testified that if he read a wind advisory predicting gusts of 55 miles an hour, he would shut down rentals. (Dep. of Jon Maris at 47.)

Karen Ambrosius, in her deposition testimony, testified that "[w]here we had sustained winds, . . . meaning constant winds of 30 miles per hour we would not send a boat out." (March 3 Tr. at 226 (Dkt. No. 312-1) (quoting deposition testimony).) Ms. Ambrosius had the authority and discretion to decide if boat rentals should be shut down. She had previously exercised that authority, shutting down boat rentals if sustained winds reached thirty miles an hour or if the National Weather Service had issued a wind advisory.

Robert Grippentog, who with other family members, runs Las Vegas Boat Harbor on Lake Mead, testified in his deposition that his business does not rent power boats if the sustained wind speeds are 25 miles an hour. (Dep. of Robert Grippentog, Jr. at 43.)

According to Horace Schuler, the general manager of Lake Mohave Resort outside of Bullhead City, Arizona, if the weather forecast was for sustained winds of 25 to 35 miles an hour, gusting to 55 miles an hour, the resort would not rent ski boats. (Dep. of Horace Schuler at 105.)

D. <u>Karen Ambrosius Stops Boat Rentals</u>

Ms. Ambrosius testified that she was unaware of either the updated weather forecasts or the wind advisories. Ms. Ambrosius claimed that it was not until approximately 10:30 a.m.,

8

when she heard the National Weather Service wind advisory on Channel 16, that she knew that high winds were predicted. According to Ms. Ambrosius, she then walked outside and looked at the lake. Only then did she decide to end boat rentals.

Ms. Ambrosius also testified that the Prescott Party had told her that they would be gone for only half a day. This testimony is contrary to the testimony of Ms. Coon, James Brady, Heather Brady and Robert Graham.

When asked what steps she had taken to alert the Prescott Party of the high winds, Ms. Ambrosius testified that both she and her office manager called the dispatch at the National Park Service and told them that the boat was late. But there is no record of any calls being made to the National Park Service until after Boat 647 had sunk. (Ex. J-39 at BAJA00036, Ex. J-40.) According to Steve Luckesen of the National Park Service, if calls had been made to the National Park Service, they would be reflected in the National Park Service log. (Dep. of Steve Luckesen at 517.)

She also claimed that she called the Aramark parts room, asked that if there was a chase boat available, and said "let them know that we have a boat that is late." (March 3 Tr. at 250-51 (Dkt. No. 312-1).) Nothing in the record supports this claim, and Ms. Ambrosius admitted that she could not testify that she sent a chase boat to search for Boat 647.

Ms. Ambrosius did not attempt to call Dangling Rope Marina to have personnel there warn the Prescott Party of the high winds although she knew that the Prescott Party would stop there to refuel. She did not notify any of the tour captains to watch for Boat 647 and alert them of the danger. She did not attempt to call the Prescott Party on the marine radio. (Although that would have been futile because Mr. Brady did not turn on Boat 647's radio.)

9

In sum, the court finds that Ms. Ambrosius did nothing to locate Boat 647.

E.   The Prescott Party's Trip

The Prescott Party left the marina at about 8 a.m. James Brady was operating the boat because he had the most experience. During the trip to Rainbow Bridge, Heather Brady took photographs. Once they arrived at Rainbow Bridge, the party (with the exception of Katherine Taranto) hiked to the Rainbow Bridge monument. When they returned to the dock, they met some hikers who were waiting for a boat to arrive. James Brady tried to call Dangling Rope Marina to tell someone there about the hikers, but he could not contact the marina. He again turned off the radio.

The Prescott Party began the return trip to Wahweap Marina. They stopped, as they had been instructed to do, at Dangling Rope Marina to refuel. Once the boat had been refueled, the Prescott Party left. As they were leaving Dangling Rope, Heather Brady saw both a tour boat and a National Park Service boat apparently headed toward Dangling Rope Marina.

F.   Boat 647 Sinks

After the Prescott Party left Dangling Rope, the channel became more open and the water was choppier. Heather Brady moved to the back seat to be more comfortable. No one in the Prescott Party was wearing a life jacket.

When they reached an area of the lake called Padre Bay (on the Utah side of the state line), the water grew rougher and spray came over the bow. Heather Brady felt water at her feet and she called to her husband. She heard him calling "mayday, mayday, mayday, vessel 647" over the radio. (March 4 Tr. at 411 (Dkt. No. 310).) She jumped out of the boat and grabbed one of the life jackets that floated by her. She swam with the life jacket to Terry Taranto and gave it

10

to him. She grabbed another life jacket and swam to her husband. Then Terry Taranto "came over a wave and said, 'I need a life jacket. I need a life jacket.'" (Id. at 414.) She found an extra life jacket and gave it to him. She and Jim Brady, using the life jackets they found floating in the water and a blue canvas bag that was also in the water, were able to reach a rock pile. They climbed on the rock pile and waited until they were rescued by a National Park Service boat. The other members of the Prescott Party did not survive.

When Boat 647 was recovered, it did not have a breached hull. The boat had no value.

## CONCLUSIONS OF LAW

Aramark has filed a petition under the Limitation of Liability Act, 46 U.S.C. §§ 30501-30512, seeking exoneration or limitation of liability under 46 U.S.C. § 30505 (titled "General limit of liability"). Section 30505 provides that "the liability of the owner of a vessel for any <u>claim, debt, or liability described in subsection (b)</u> shall not exceed the value of the vessel and pending freight." 46 U.S.C. § 30505(a) (emphasis added). The Act does, however, create an exception to that general rule by defining "claim, debt, or liability": "claims, debts, and liabilities subject to limitation under subsection (a) are those arising from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damages, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, <u>without the privity or knowledge of the owner</u>." 46 U.S.C. § 30505(b) (emphasis added).

Courts use a two-step inquiry to determine whether a petitioner is entitled to exoneration or limitation of liability when sued for negligence. "First, the court must determine what acts of negligence . . . caused the accident. Second, the court must determine whether the shipowner had

11

knowledge [of] or privity [with the person who committed] those same acts of negligence . . . ." Farrell Lines, Inc. v. Jones, 530 F.2d 7, 10 (5th Cir. 1976). The claimant bears the burden of proving negligence and if successful, the burden shifts to the shipowner to prove lack of knowledge or privity. Id.

I. ARAMARK'S NEGLIGENCE

Torts occurring on navigable waters are governed by maritime law. "The elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law." Withhart v. Otto Candies, L.L.C., 431 F.3d 840, 842 (5th Cir. 2005) (citations omitted). A claimant must prove "a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between [the] defendant's conduct and the plaintiff's injury." In re Cooper/T. Smith, 929 F.2d 1073, 1077 (5th Cir. 1991).

A. Duty/Breach

"Under Maritime law, a plaintiff is owed a duty of ordinary care under the circumstances." In re Great Lakes Dredge & Dock Co. LLC, 624 F.3d 201, 211 (5th Cir. 2010). "We hold that the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 632 (1959).

The court in In re Signal Int'l, LLC, 579 F.3d 478 (5th Cir. 2009), gave a thorough analysis of duty in a maritime negligence action. In Signal, the owner of two barges named the MISS TIFF and the JACK KING filed a petition under the Limitation of Liability Act, when the

two barges broke loose from their moorings during Hurricane Katrina and allided[3] with a bridge located approximately 4.7 miles away on Interstate 10 in Mississippi. The Mississippi Department of Transportation (MDOT) repaired the bridge and opposed Signal's petition. The Fifth Circuit affirmed the order of the trial court denying, after a bench trial, exoneration but granting limitation of liability.

The trial court found that Signal had used "an improvised, untested method" of securing the two vessels and that Signal's negligence caused the allision. Id. at 486. Signal argued that it was entitled to exoneration because the damage to the bridge was not a foreseeable consequence of its negligent mooring of the two vessels. The Fifth Circuit rejected Signal's argument:

> The critical question in this case is whether the allision with the Interstate 10 bridge was a harm of the general sort to an entity of a general class that a reasonably thoughtful person might have anticipated to result from Signal's negligent mooring of the MISS TIFF and the JACK KING in light of the anticipated natural forces wrought by Hurricane Katrina. As the question makes clear, our analysis does not focus on the particular allision site, but the general risk of allision; it does not focus on MDOT, but on the class of property owners in the paths available to the runaway barges.

Id. at 492. The court cautioned: "The test of foreseeability is not measured against normal conditions, but those that were anticipated or reasonably should have been anticipated." Id. at 493. Looking at the facts of the case, the court concluded that "the approaching hurricane, the expected height and predicted movement of the storm surge, and the topology of the Pascagoula River basin gave rise to the need to moor the barges and made this allision a foreseeable consequence of negligence in that mooring." Id.

---

[3]"An allision is a collision between a moving vessel and a stationary object." Signal, 579 F.3d at 484 n.4 (internal quotation marks and citations omitted).

Here, the court concludes that Aramark breached its duty of reasonable care when it allowed the Prescott Party to leave the morning of April 25, 2009. The court bases this conclusion on the following:

### 1. *The weather forecasts and wind advisories*

As detailed above, the forecast at 3:18 in the afternoon on April 24 for Zone 5 showed that a wind advisory was in effect from 8 a.m. to 7 p.m. on April 25. Then, around 3 a.m., April 25, the National Weather Service issued wind advisories for both Zone 5 and Zone 21. Yet Ms. Ambrosius denied having seen or heard any forecast that contained that information. According to Ms. Ambrosius, the first she was aware of the wind advisory was when she heard the information on Channel 16 around 10 a.m. the morning of the 25th. But throughout Ms. Ambrosius' testimony, as the court has noted above, her recounting of the events of April 24 and 25 differed significantly from other evidence. For that reason, the court concludes that Ms. Ambrosius did not have an accurate memory about those events and the court cannot rely on her testimony.

Aramark, primarily Ms. Ambrosius, had a duty to be advised of the current weather forecasts and wind advisories before allowing any party to leave the marina in an Aramark power boat. This is particularly true because, as Aramark knew, in the spring, the weather changed constantly. Phyllis Coon testified that in the spring, shutting down rentals was considered almost on "an hourly basis" because of the erratic weather. (March 4 Tr. at 337 (Dkt. No. 310).) And "[s]pringtime is always windy on the lake." (Dep. of Donald Scott Bergantz at 107.)

Moreover, the water could be very cold in April which could lead to hypothermia if boat passengers were in the water.

2. *Boat 647*

The boat owner's manual cautioned that when wind speeds reached 31 miles an hour, only experienced operators might be able to safely operate the boat. Yet Aramark rented to anyone eighteen years or older, with a valid driver's license, without regard to that person's previous boating experience.

Because Boat 647's length exceeded twenty feet, the boat did not have positive flotation and could not remain afloat when filled with water.

The court, when it considers these facts, concludes that Aramark had frequently in the past recognized that high winds could be dangerous to boaters. Aramark should have been aware, if it was not, that high winds were forecast for April 25, 2009. And it was foreseeable to Aramark that if those who had rented Baja 202 Islanders for a trip on Lake Powell the morning of April 25, 2009, were allowed to depart, the boats could sink because of the high winds. It was further foreseeable to Aramark that if the boats sank, particularly in the cold April water, the passengers could suffer injury and even death. Aramark breached that duty when it allowed the Prescott Party to leave.

B. Causation

Aramark's negligence is actionable only if its action was the legal cause of the Claimants' injuries, which is "something more than 'but for' causation, and the negligence must be a 'substantial factor' in the injury.'" Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992), quoting Thomas v. Express Boat Co., Inc., 759 F.2d 444, 448 (5th Cir. 1985).

Here, the court concludes that Aramark's failure to stop the Prescott Party from leaving

15

was a substantial factor in the sinking of Boat 647 and the resulting harm. Even though Aramark argues that Boat 647 sank because of the actions of the Prescott Party, the court concludes that the failure to stop the boat from leaving was a substantial factor in the sinking of the boat.

In <u>Thomas v. Express Boat Co., Inc.</u>, 759 F.2d 444 (5th Cir. 1985), Lance Thomas, a crewman aboard a rig supply boat, sued the operator of the boat, Express Boat, for injuries he sustained while mooring the rig supply boat to an offshore drilling rig. The rig was owned and operated by Penrod Drilling Company (Penrod). The lower court decided that Penrod was negligent because as part of the mooring procedure, it had presented a frayed line to the rig supply boat. (A jury had previously found that Express Boat was negligent and returned a verdict in favor of Mr. Thomas.) The court allocated one-third of the responsibility to Penrod. On appeal, Penrod (and Mr. Thomas, whose damage award was effectively reduced by the allocation of fault) argued that the evidence was insufficient to prove that Penrod's negligence was a legal cause of Mr. Thomas' injuries. The appellate court affirmed the trial court's decision holding that Penrod's negligence in presenting the frayed rope was more than "but for" causation of Mr. Thomas' injury and was a "substantial factor in the injury." <u>Id.</u> at 448. In response to appellants' argument that the captain of the rig supply boat was negligent and caused the injury because he made the decision to bring in the frayed line, the court stated: "The danger in sending a frayed line to a vessel in such poor weather was certainly foreseeable. Although [Captain] Peterson also may have been negligent in deciding to bring in the line, this does [not] excuse Penrod's negligence." <u>Id.</u> The court noted that, "because Penrod's negligence [in presenting the frayed rope] made [Captain Peterson's] decision necessary, the district court properly concluded that Penrod bears some responsibility for the accident." <u>Id.</u>

16

Here, similar to the facts in Thomas, as this order details above, the danger of allowing the Prescott Party to depart the morning of April 25, 2009, certainly was foreseeable to Aramark.[4] Regardless of whether the members of the Prescott Party made wrong choices while on the boat, the harm was, at least in part, the result of Aramark's initial negligence and so Aramark "bears some responsibility for the accident." Id.

Whether the Prescott Party's actions contributed to the loss must be resolved in another proceeding.

## II. PRIVITY

Because Claimants have proven negligence, the burden shifts to Aramark to show that it did not have knowledge of the acts of negligence and was not in privity with the negligent actor. Farrell Lines, Inc. v. Jones, 530 F.2d 7, 10 (5th Cir. 1976). "When a corporation owns the vessel, the test is whether culpable participation or neglect of duty can be attributed to an officer, managing agent, supervisor, or other high-level employee of the corporation." Carr v. PMS Fishing Corp., 191 F.3d 1, 4 (1st Cir. 1999) (citations omitted).

Aramark has not met its burden. The testimony, including that of the general manager, Karen Ambrosius, was clear that the general manager had the discretion and authority to close boat rentals. In fact, it was Ms. Ambrosius who belatedly made the decision to close rentals on April 25, 2009.

---

[4] See In re: Signal Int'l, LLC, 579 F.3d 478 (5th Cir. 2009), for a discussion of the role of foreseeability in both duty and causation: "We have historically considered foreseeability relevant to both the duty and proximate cause determinations." Id. at 490 n.12 (citations omitted).

## III. CONCLUSION

The court denies Aramark's petition to exonerate it or limit its liability. The court does not make any findings or reach any other conclusion regarding the other allegations of negligence asserted by the Claimants. It also makes no findings or conclusions concerning whether anyone in the Prescott Party was also negligent. These questions are to be resolved in another proceeding. The court ORDERS that all pending motions are denied as moot.

DATED this 29th day of August, 2014.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge